RICE, STIX DRY GOODS COMPANY, Appellant, v. JAMES B. SALLY; SARAH H. SALLY, Interpleader.

**In Banc, October 19, 1906.**

1. **PLEADING: Legal Conclusions.** An allegation in the answer to the interplea that a writing signed by defendant "did not give to interpleader any right, title or interest in or to the property referred to in said writing, the same being null and void," is a legal conclusion, and amounts to nothing more than a general denial.

2. ———: ———: **Estoppel.** And so also is a mere allegation that "said interpleader is by her conduct estopped from claiming any right title or interest in or to said property, and estopped from claiming the existence of any indebtedness to herself from defendant."

3. **ATTACHMENT: Conveyance of Property to Interpleader: Necessary Proof.** To sustain the averment that prior to the date of the attachment the defendant had conveyed the property attached to interpleader by chattel mortgage it devolved upon interpleader to show, as against the attaching creditor, not only a duly executed and acknowledged mortgage, but that possession of the property had been delivered to and retained by interpleader thereunder, or that the same had been recorded in the county where defendant resided before the levy of the attachment writ.

4. ———: ———: ———: **Possession.** In this case, the chattel mortgage was not recorded in the county where the attachment debtor resided, but it is held that there was sufficient evidence that possession of the property had been delivered to interpleader, and that the possession was so open, notorious and unequivocal, to take the case to the jury.

5. ———: ———: ———: ———: **Proof that Possession was Notorious.** Actual and unequivocal possession having been established by the evidence, that it was notorious can be shown by a sign board put up on the store with the interpleader's name on it as owner, and by announcement, to persons in the store and to those who came to trade and to the few visitors at the store in the little village where it was situated, that the goods had been conveyed to interpleader and the store was in her hands.

6. ———: **To Hinder, etc.: Instructions.** Where no issue is made by the pleadings that the conveyance made by the attachment debtor by chattel mortgage to his wife was made to hinder, delay and defraud his creditors, and no evidence was introduced tending to show any fraud on the part of the interpleader except that she was his wife, instructions on those subjects should not be given.

7. ———: **Mortgage: Indebtedness.** The consideration for a chattel mortgage given by the attachment creditor to interpleader is proven prima-facie by the instrument itself; and where the bona-fides of the indebtedness is not attacked by the pleadings, evidence tending to prove its amount and source is merely cumulative, and any error in its admission cannot do the attachment creditor harm.

Appeal from Webster Circuit Court.—*Hon. Argus Cox*, Judge.

AFFIRMED.

*Lyon & Swarts* for appellant.

(1) Evidence of Mrs. Sally's pecuniary condition at and prior to the time of the trial was erroneously admitted. Rice v. Sally, 176 Mo. 140; Ritter v. Bank, 87 Mo. 574; State v. Brassfield, 81 Mo. 151; Holdberg v. Kahn, 76 Mo. App. 501; Gorham v. Auerswald, 53 Mo. App. 131. (2) Instruction 1, given for the

interpleader, was erroneous: (a) Because it assumes the truth of a controverted fact. Wilkerson v. Eilers, 114 Mo. 245; Robertson v. Drane, 100 Mo. 273; Fire Ins. Co. v. St. Mary's Seminary, 52 Mo. 480; Blasland-Parcels-Jordon Shoe Co. v. Hicks, 70 Mo. App. 301. (b) Because the element of good faith on the part of the interpleader is omitted therefrom. State to use v. O'Neill, 151 Mo. 67; Stewart v. Outhwaite, 141 Mo. 562. (c) Because it does not sufficiently define the character and change of possession necessary to the validity of the mortgage. Rice v. Sally, 176 Mo. 107; State to use v. O'Neill, supra; State ex rel. v. Goetz, 131 Mo. 675; Petring v. Chrisler, 90 Mo. 649. (d) Because of the undefined use of the words "by a preponderance of evidence" in the connection in which they were used. Morton v. Heidorn, 135 Mo. 608. (e) Because of the omission of the statutory words "or defraud." R. S. 1889, sec. 5170 (sec. 3398, R. S. 1899); Burgert v. Borchert, 59 Mo. 80; Crow v. Beardsley, 68 Mo. 435; State to use v. Nauert, 2 Mo. App. 295. (3) The court should have given the plaintiff's instruction in the nature of a demurrer to the evidence. Rice v. Sally, 176 Mo. 107; Balz v. Nelson, 171 Mo. 682; Bank v. Winn, 132 Mo. 80; Riley v. Vaughan, 116 Mo. 176; Hite v. Railroad, 130 Mo. 132; Reichenbach v. Ellerbe, 115 Mo. 588; Jackson v. Hardin, 83 Mo. 175; Vietor v. Swisky, 200 Ill. 257; Lynch v. Mercantile Co. (Neb.), 96 N. W. 524.

*J. B. Harrison* and *J. P. Nixon* for respondent; *L. F. Parker* of counsel.

(1) The note and chattel mortgage read in evidence import a consideration, and being valid on their face are, if accompanied by actual possession, evidenced by such open and visible acts as to reasonably advise and inform the community of such change of title and possession, prima-facie evidence of title in the inter-

pleader. R. S. 1899, sec. 894; Lindell v. Rokes, 60 Mo. 249; Taylor v. Newman, 77 Mo. 257; Ettlinger v. Kahn, Lehnhard, Interpleader, 134 Mo. 492. (2)   The instructions of the court on the question of fraud and the necessity of proof of participation of the mortgagee in order to defeat the chattel mortgage are in accordance with repeated rulings of this court. Bank v. Winn, 132 Mo. 80; Crothers v. Busch, 153 Mo. 606; Wall v. Beedy, 161 Mo. 625; Alkire Grocer Company v. Ballenger, 137 Mo. 369.   (3)   There was no evidence in the cause to overcome the prima-facie case made by the introduction of the note and chattel mortgage, and proof of open and visible delivery of possession, and retention thereof, and all instructions asked by plaintiff, which were refused, concerning the law of fraudulent conveyances, were properly refused, and all those that were given on that subject might well have been refused. Ettlinger v. Kahn, Lehnhard, Interpleader, 134 Mo. 492; Crothers v. Busch, 153 Mo. 606; Bank v. Winn, 132 Mo. 80; Wall v. Beedy, 161 Mo. 625.

BRACE, C. J.—This is an appeal from a judgment of the Webster  Circuit  Court  in favor  of Sarah H. Sally, Interpleader, in a suit instituted by Rice, Stix & Company, creditor, against James B. Sally, the husband of the said Sarah H., their debtor, in which certain goods, wares and merchandise, located at Lecoma, Dent county, Missouri, were seized by the sheriff on the 25th of October, 1897, under attachment process issued therein.

Mrs. Sally in her interplea claimed the property so seized, under and by virtue of a chattel mortgage, duly executed and acknowledged by the said James B. Sally on the 21st day October, 1897, and recorded in Dent county on the 22nd day of October, 1897; given to secure the payment of a promissory note of the said James B. Sally of the same date for the sum of $10,500,

payable to the said Sarah H., one year after date, with eight per cent interest; which, it was alleged in the interplea, was given by the said James B. Sally in part payment of the sum of $12,465.62 due and owing by him to the interpleader on account of moneys received by him belonging to her as her separate estate. The mortgage and the several items of this indebtedness are set out in detail and at great length in the interplea. The answer to the interplea is as follows:

"Plaintiffs, Rice, Stix & Company, for answer to the interplea of Sarah H. Sally filed in this case, admit the allegations thereof that said interpleader is and was the wife of said defendant, James B. Sally, from September, 20, 1883, to the present time. Plaintiffs deny each and every other allegation of said interplea.

"For further answer, plaintiffs allege that if said defendant signed and executed the said writing. set forth in said interplea (and which is denied by plaintiffs), the same did not give to said interpleader any right, title or interest in and to the said property referred to in said interplea, the said writing being null and void.

"For further answer to said interplea, these plaintiffs allege that said interpleader is by her conduct estopped from claiming any right, title or interest in and to the said property, and estopped from claiming the existence of any indebtedness from said defendant to herself.

"Wherefore, the plaintiffs pray judgment for the retention of said property."

The reply was a general denial of the allegations of the answer, and, upon the issues thus joined, a trial was had which resulted in a verdict and judgment for the interpleader, from which the plaintiff appealed to this court, where the judgment was reversed and the cause remanded for new trial; and, in due course, the case was again tried on the same pleadings and from

this second trial, in which the interpleader again obtained verdict and judgment, this appeal is taken.

The case on the former appeal is reported in 176 Mo. 107, et seq., and the elaborate statements contained in the opinions there reported obviate the necessity of a more extended statement here.

Since the case has been pending plaintiff has been substituted for Rice, Stix & Co., the original plaintiffs.

As will be observed the answer contains a general denial and two legal conclusions, with no facts stated upon which to base either of them; and the whole answer, so far as the facts are concerned, amounts to no more than a general denial of the material allegations of the petition. The material ultimate fact charged in the petition was that James B. Sally, under whom plaintiff claimed the property by virtue of the attachment process levied on the 25th of October, 1897, had, prior to that date, to-wit, on the 21st of October, 1897, by the chattel mortgage in question, conveyed the property levied upon to the interpleader. In order to sustain the averment it devolved upon the interpleader to show as against the plaintiff not only a duly executed and acknowledged chattel mortgage, but that possession of the property had "been delivered to and retained" by the interpleader thereunder, or that the same had been recorded in the county in which the said James B. Sally resided before the levy of the writ of attachment. [R. S. 1899, sec. 3404.]

James B. Sally resided in the county of Phelps. The chattel mortgage was recorded in the county of Dent, so that the only ground upon which the interplea could be maintained was that possession of the property had been delivered to and retained by Mrs. Sally as required by the statute; and, under the pleadings, that was the material issue of fact in the case. On this issue, in addition to the evidence on the first, much additional evidence was introduced by the interpleader on

the second trial, now under consideration. It appeared from that evidence that for two or three years prior to the 21st of October, 1897, the said James B. Sally had been running a general country store in the village of Lecoma, in Dent county. The village is situate in the Northwest corner of Dent county, near the line between that and Phelps county, and distant about twelve miles from Rolla, which is the nearest railroad station. The village was a small one, the only business concerns being Sally's store, a planing mill and a blacksmith shop. The trading of the neighborhood generally was done at the store, and it seems to have been the most public and important place in the village. It had no sign on it and needed none. Sally had three clerks in his employ, viz., John A. Sally, Pat Smith and George Martin. The chattel mortgage was executed at Rolla, Phelps county, on Thursday, October 21, 1897, between ten and eleven o'clock p. m., and early in the morning on Friday, the 22d, the interpleader and her attorney in fact, J. B. Harrison, appeared at the store house of J. B. Sally, in Lecoma, and took possession of the stock of goods, accounts, etc., therein contained and now in question, under the mortgage, as authorized by J. B. Sally so to do, in manner, as testified to by Mr. Harrison, as follows:

"Q. Who were the clerks, Mr. Harrison, of J. B. Sally in that store? A. George Martin, Pat Smith and John Sally. When they all came up there I announced to them the fact that Mrs. Sally had a chattel mortgage executed by James B. Sally to her on this stock of goods and he had placed her in possession of it. Mr. Sally, at that time, had driven that far with us and had told John Sally to deliver his key to us. We discussed the matter with the clerks; I told them everything that must be done in order to make everybody understand that we had possession of it. I told John Sally to go and have a sign painted the first thing.

. . . I then announced to a number of parties there that we had possession of the store under the chattel mortgage and exhibited the chattel mortgage to them. I held it up in my hand in that way (indicating) to the crowd.

"Q. Where were you at that time? A. I was standing right in the door of the store, in the south door of the store building.

"Q. Now, what did you do? A. Well, I exhibited the chattel mortgage and made that statement.

"Q. What did you say in connection with exhibiting the chattel mortgage, if anything? A. I said we had taken possession of the property for Mrs. Sally and in no event would she recognize any further claims of J. B. Sally and would not purchase goods in his name nor pay any of his debts; that the sales from now on would be conducted as much for cash as possible. I instructed Pat Smith, one of the clerks, to go with me to the books, and he did. I told him that all the accounts in the books belonged to Mrs. Sally. We had at that time these accounts made out in the nature of a statement, and they were endorsed on the back by Mr. Sally.

"By the Court: Q. What were those statements? A. They were itemized statements of the accounts, and on the back J. B. Sally's name was endorsed—written on the back.

"Q. What became of those statements? A. There were ten or fifteen of them, may be twenty.

"Q. What became of them? A. I turned them over to John Sally to collect. . . . Witness continuing: I told Mr. Smith to balance all the accounts and run a red line under them.

"Q. That was the 22nd day of October? A. Yes, sir; that was the 22nd day of October, 1897. . . .

"Q. What did you tell him you wanted that done for? A. Well, I told him I wanted to open up the ac-

198 Sup—44

counts in Mrs. Sally's name, in the entire ledger; that those accounts all belonged to her. . . . .

"Q. Then what took place? A. I then went around over the building to see if I could see anything of any signs. I did not find J. B. Sally's name on anything except it appeared on some goods boxes that had been shipped there; that was the only thing I noticed with his name on.

"Q. What did you do then? A. I went to destroying everything in the nature of signs with his name on. . . . I destroyed everything in the nature of signs indicating that J. B. Sally owned that stock of goods.

"Q. Now, if there was any arrangement made to retain the clerks, state about it? A. Yes, sir; I spoke to John Sally, Pat Smith and George Martin right there in the presence of Mrs. Sarah H. Sally, and asked them if they were willing to work for the same wages and on the same terms for Mrs. Sally as they had been working for Jim Sally, and they all said they were. I told them then to consider themselves employed.

"Q. For whom? A. For Mrs. Sally; I told them to announce that fact to everybody—to announce the change of possession to everyone.

"Q. Was there anything said about receiving more goods; if so, what was said and to whom about that? A. I instructed all the clerks not to receive any goods from Rolla or from any other place that had been shipped to J. B. Sally or bought by him, which were not already in the store.

"Q. Now, then, outside of the store, did you give notice as to the condition of the store, as to who was the owner of it? A. I did to everyone I met.

"Q. Do you recollect any of them? A. I did to everyone I talked with. I went from there to Salem.

"Q. When did you return now and what took place

then? A. When I returned there was a crowd of customers in the store.

"Q. At what place? A. The store house at Lecoma.

"Q. How many were there then? A. There were ten or fifteen persons present.

"Q. What was done then? A. I stated there publicly and asked those parties that were there to notify others that a change had taken place, that Mrs. Sally had purchased that stock of goods, or had a chattel mortgage on it and was in possession of it and was running and operating it in her own name. I also announced that I had a power of attorney for Mrs. Sally and was in absolute control of it for Mrs. Sally."

He further testified that he was at Lecoma on the following Sunday and Monday and saw the sign which he had ordered, on the front of the store, the sign being a board about four feet long and six inches wide, on which was painted the words: "Mrs. Sarah H. Sally's Store;" that he could read it from the middle of the road.

Pat Smith testified as follows: That he was bookkeeper for J. B. Sally until the morning of the 22d of October, when Mrs. Sarah H. Sally and J. B. Harrison came to Lecoma and took possession of the stock of goods, including the books, which had theretofore belonged to J. B. Sally, being the same goods and books that were attached in the attachment proceedings of Rice-Stix Dry Goods Company against J. B. Sally. Under directions of J. B. Harrison, acting for Mrs. Sally, he sold goods for account of Mrs. Sally from the morning of the 22nd until the night of the 25th, when the goods were seized; that, under the direction of Mr. Harrison, he had drawn red lines under all accounts in the ledger and had opened new accounts for all customers to whom goods were thereafter sold; that during the entire time from October 22nd until the store was

closed by the sheriff, it was the general talk there that the store belonged to Mrs. Sally, and that the clerks had to explain it all the time to customers asking questions, and that they told them it belonged to Mrs. Sally and was run in her name; that Mr. Sally had never had a sign on the store.

John A. Sally testified: That he was selling goods at Lecoma in October, 1897, for his brother James B. Sally, in the latter's store; that Mr. Harrison and his brother's wife, Mrs. Sarah H. Sally, came to the store early in the morning of October 22nd, 1897; that he would not be positive about the day of the week, but believed that it was on Friday; that the attachment was levied on the Monday after they came there on Friday; that the store was run two days after they came there until Sunday and therefore it must have been on Friday that they came there, in the morning, about seven o'clock; that after they got there Mr. Harrison gave them notice that the store and goods had been transferred to Mrs. Sally and said that everything had been transferred to her and to change all the accounts, etc., and to give all orders in her name; that Mr. Harrison said to him that the transfer had been made by chattel mortgage; that he was already at the store when Mr. Harrison and Mrs. Sally went there; that Mr. Harrison said that the business from that time on should be carried on in her name instead of in his brother's name, and that they should not receive any goods shipped in his brother's name, and that they should not do any more credit business than they could help, and if they sold anything on credit to open up the account with Mrs. Sally, and that the accounts were to be changed and kept in her name; that Mr. Harrison gave orders for the bookeeper to draw a red line under each account and he (the bookeeper) changed it in that way; that Mrs. Sally told him and several there that it was her store; that Mr. Harrison said that they should go ahead

with the same clerks and that all the clerks that were there should stay there; that Mr. Harrison ordered all signs that were hanging on the wall to be taken down, these signs' being some shoe signs of the Hamilton-Brown Shoe Company or something like that, "sold by by James B. Sally," or something like that, and that these signs were taken down, some of them by the witness himself, and that Mr. Harrison stated publicly to parties and customers around the store or anybody that happened to be there that the store had changed hands, and that it was her store and she had charge of it. He further testified that in pursuance of Mr. Harrison's instructions to get and put up a sign with "Mrs. Sarah H. Sally's Store" on it, he, on Friday, employed a Mr. Chamberlin to paint such a sign, but the sign not being finished Friday evening he procured 'a temporary one to be made in Rolla by a Mr. Tucker, which he put up on Saturday morning by nailing it to the front of the store building on the south side of the door. The sign was a white board about four feet long and six inches wide with the words "Sarah H. Sally's Store" in black letters painted thereon; that on the following Sunday and Monday he saw the sign up where he had placed it, and on the following Tuesday or Wednesday after the goods had been seized by the sheriff he saw it on Mr. Lenox's porch just across the road from the store.

George W. Smith (the village blacksmith) testified: That he had considerable dealings with J. B. Sally at the store and at the shop and all around; that he remembered Mrs. Sally coming there with Mr. Sally the latter part of the week, and knew that Mr. Harrisson was at the shop and that she was there in town; that the store was closed up on Monday following the time he saw Mrs. Sally there the week before; that she was there Thursday or Friday and the store ran until the evening of the following Monday, about three days

or something like that; that he heard she had taken possession of the store; that he was in the habit of going there every evening to settle up his bills; that they had put up a sign on the building near the door which read "Mrs. Sarah H. Sally," "I believe it was;" that he saw it up Saturday evening and on Sunday.

E. E. Comstock (the miller) testified: That in October, 1897, he was doing business with that store; that he had a lumber yard and mill and the store frequently gave orders on the mill, and that he also gave orders on the store for merchandise; that he recollected Mrs. Sally taking possession of the goods about October 22, 1897, when he saw Mr. Harrison and Mrs. Sally about the store there; that he was notified by one of the clerks of that store "that if I should give any orders, to give them in the name of Mrs. Sally, and that if I received any orders, they were to be sent to me in her name, and my books were changed at the time."

C. L. Taylor testified that he was to do the lettering on the sign which Chamberlin was preparing, but it was never finished; that in the meantime a sign was sent out from Rolla which he saw on the platform of the store leaning against the house on Saturday, October 23. The sign read "Sarah H. Sally's Store."

Mrs. Mary J. Pemberton testified that she went to the store to do her shopping on Saturday, the 23rd of October, directly after breakfast, and when stepping upon the step she saw a sign with the name of Mrs. Sarah H. Sally on it leaning against the wall.

P. M. Lenox testified that he saw the sign there on Sunday, the 24th of October; before that time he saw Mrs. Sally washing up the queensware and glassware in the store, and that was the first he knew of the store changing hands.

Ben Harrison testified that he saw the sign on the front of the store Sunday evening and on Monday.

J. C. Williams that he saw the sign Saturday morn-

ing south of the door going into the building; his attention was called to it by George A. Martin who was clerking there.

Mrs. Clara Lenox, who lived across the road opposite the store, testified that early Saturday morning she saw Mrs. Sally's sign, from the porch of her house, resting on a bench on the porch of the store—"Mrs. Sarah H. Sally's Store" was on the sign; that prior to the time Mrs. Sally took possession there was no sign on the store.

Mrs. Sally's evidence on this issue was about the same as on the former trial, and George M. Tucker testified that he painted a sign for John Sally and that the substance of what was on it was "Mrs. Sally's Store." There was some other evidence corroborative and cumulative of the foregoing, but this is sufficient to show the interpleader's case on this issue and for a ruling on plaintiff's demurrers to her evidence.

On behalf of plaintiff several witnesses were introduced who testified that during the time they were respectively in Lecoma from Friday morning until Monday evening they saw no sign to indicate a change of ownership, but with this evidence we have no concern on this ruling.

I. Whatever may be thought of the action of the court in refusing to sustain the demurrer to the evidence of interpleader on the first trial, it seems beyond question that the court did not err in overruling the demurrers to her evidence on the second trial. While it is true, as was ruled on the former appeal, that it devolved on the interpleader to show that the possession of the mortgaged goods was "delivered to and retained" by her before the seizure by the sheriff; that such change of possession was open, notorious and unequivocal, such as to apprise the community or those accustomed to deal with the party that the goods had changed hands, regard being had to the situation and

character of the property; it is also true in this case that nothing in regard to the change of possession was done in a corner. It was made with wide open doors and by public proclamation, and according to interpleader's evidence the indicia of former ownership was wiped out, and that of the new owner installed as obviously and with as much expedition as the nature of the case would admit. That it was open and unequivocal is beyond question. Was it so notorious as to apprise the community and those accustomed to deal at the store that the goods had changed hands? The sign, which, according to interpleader's evidence, after an early hour on Saturday morning, might have been seen by all persons entering the store or passing along the public highway in front of it, proclaiming that this was "Sarah H. Sally's Store," would seem to have afforded sufficient notoriety. But if that were wanting, can anyone, familiar with life in a small village like this, doubt for a moment that everything that transpired in that store on Friday morning was known throughout the community trading there in the shortest possible time? It was the business and news center of the community. The change was doubtless the most important village event of the season. Thoroughly canvassed, the news spread from store to mill and blacksmith shop and thence throughout the entire community before the sun went down on the day it happened. Who doubts it, knows little about the pervasive celerity with which village news was wont to spread from house to house in the adjoining neighborhood even before the days of the telephone. Under the circumstances it is difficult to see how the change of possession could have been made more open, notorious or unequivocal than it was, and the court committed no error in sending the case to the jury.

II. The instructions upon which this issue was submitted to the jury are not complained of. But it is

contended that the court committed error in instructions given for the interpleader, and in refusing instructions asked for the plaintiff, on the issue of whether the chattel mortgage was given by James B. Sally for the purpose of hindering, delaying or defrauding his creditors, and whether the interpleader participated in his fraudulent act and purpose. While the instructions on this subject may be obnoxious to some verbal criticism, as a whole, they presented that issue to the jury fairly and much more favorably to the plaintiff than it was entitled to, for two all-sufficient reasons: first, because there was no such issue made by the pleadings, and the same ought not to have been submitted to the jury at all; and, second, because whatever James B. Sally's intention may have been, no evidence was introduced tending to show any fraud on the part of Mrs. Sally, except that she was his wife.

III.   It is also contended that the court committed error in the admission of certain evidence tending to prove the amount and source of the indebtedness for which the note secured by the chattel mortgage was given — principally, admissions of James B. Sally; but as the bona-fides of the indebtedness was not attacked by the pleadings and the consideration for the chattel mortgage was proven prima-facie by the instrument duly executed, this evidence was merely cumulative and any error in the admission thereof could have done the plaintiff no harm.

Finding no error in the record calling for a reversal, the judgment of the circuit court is affirmed.

All concur except *Gantt, J.,* absent, and *Graves, J.,* not sitting.